**Jon Paul MARSH, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–02–00362–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

July 29, 2004.

George McCall Secrest, Jr., Houston, for appellants.

Donald W. Rogers, Jr., Houston, for appellees.

Panel consists of Justices ANDERSON, SEYMORE, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

Jon Paul Marsh, a juvenile, was charged with felony murder, tried as an adult, and convicted by a jury of the offense. He was sentenced to confinement in the Institutional Division of the Texas Department of Criminal Justice for a period of seventy years. In two issues, appellant contends the trial court erred in admitting incriminating statements into evidence because (1) the statements were taken in violation of Title 3 of the Family Code and article 38.23 of the Texas Code of Criminal Procedure, and (2) the State failed to prove that appellant knowingly, intelligently, and voluntarily waived his rights. We affirm.

### I. BACKGROUND

On March 20, 2001, appellant, sixteen years old at the time, murdered his friend and neighbor, Nathan Mayoral, by hitting

him in the head with a hammer and a clay pot. Appellant placed a plastic bag over Mayoral's head, wrapped his body in a sheet, and secured the wrapping with duct tape and postal tape. Appellant loaded Mayoral's body, backpack, and coat into his vehicle. He then threw Mayoral's body into a ditch, covering it with a piece of plywood, and disposed of the backpack and coat in a storm drain. Mayoral's body was discovered nine days later.

Detectives Alex Ortiz and Allen Beall, with the Harris County Sheriff's Department Homicide Division, were assigned to investigate the murder. The detectives received information that Mayoral had been in a homosexual relationship with appellant. Beall provided a set of appellant's fingerprints, already on file with the Sheriff's Department, to the crime scene unit processing the physical evidence. Appellant's fingerprints matched those prints found on the tape wrapped around Mayoral's body. The detectives used this information to obtain a probable cause warrant from the Harris County District Attorney's Office on March 31, 2001. Subsequently, the detectives attempted to arrest appellant at his place of employment, but were unsuccessful. They set up surveillance at his residence on the evening of April 1. While there, the detectives observed appellant leave his home, accompanied by his brother, in a Jeep. A patrol unit stopped the Jeep and an officer escorted appellant to a car where Beall was waiting. Beall advised appellant that he and Ortiz were with the Sheriff's Department and were conducting an investigation into Mayoral's murder. They asked appellant to accompany them to their office and discuss the case. Appellant stated he

would be willing to talk with them, but did not know any more than what he had heard. At 7:04 p.m. that evening, the detectives transported appellant to a juvenile processing center at 333 Lockwood, the Precinct 6 Constable's office.

Appellant's brother, driving his Jeep, followed the detectives for a short time, but was stopped by another detective, Russell Coleman. Beall had instructed Coleman to stop the Jeep and explain to appellant's brother that appellant was in the custody of the Sheriff's Department for the murder of Mayoral. Beall also instructed Coleman to go to appellant's home and advise his parents that he was in custody. After arriving at appellant's home, Coleman testified he informed appellant's parents that "some new information had [come] up in the investigation of the death of Nathan Mayoral and that at that time we had a court order and we were detaining their son for the investigation."[1] Further, Coleman testified he informed appellant's parents that Beall was the lead detective and provided them with Beall's phone number and his office address at 601 Lockwood.

In the meantime, while en route to the juvenile processing office and before any questions were asked of appellant, Ortiz read appellant his juvenile statutory warnings.[2] According to the detectives, appellant was not restrained in any way and, although they were carrying their weapons, they were never used or exhibited to appellant. They arrived at the juvenile processing office at 7:57 p.m. and began interviewing appellant at 8:10 p.m. The detectives spoke with appellant regarding his relationship with Mayoral and con-

---

1. Appellant's father testified at the suppression hearing that Coleman was more vague, telling them that the officers wanted to clarify a discrepancy between something appellant told an officer and something he told one of the children in the neighborhood.

2. These warnings included appellant's right to remain silent and the fact he could be tried as an adult.

fronted him with the fact that his fingerprints were located on the tape found on Mayoral's body. At about 9:25 p.m., appellant told the detectives he and Mayoral were involved in a consensual homosexual relationship. Appellant stated he felt the homosexual relationship was an "abomination" and wanted to end it, but could not help himself when he was with Mayoral. He stated he had decided the only way to end the relationship was to kill Mayoral. Appellant also gave Beall specific information about the murder, including the location of the tape and hammer used, the presence of a sheet in his home similar to the one found on Mayoral's body, and the location of Mayoral's tennis shoes, backpack, and coat. Beall testified that these items were subsequently recovered from the areas identified by appellant. During this time, appellant did not indicate that he wanted to speak to his parents or a lawyer. The detectives did not threaten or intimidate appellant or promise him any benefits in exchange for his cooperation.

After providing this statement, appellant expressed a willingness to make a written or recorded statement. Appellant was then taken to a magistrate's office. At 10:40 p.m., appellant met with the magistrate and was admonished of his rights. Appellant indicated he understood those rights, initialed them, and the magistrate found that appellant knowingly, voluntarily and intelligently waived his rights. At 11:03 p.m., Beall and Ortiz interviewed appellant and recorded his statement. At the beginning of the interview, appellant stated he understood the legal warnings he had received and was willing to talk with them again and tell them what had happened. Appellant stated the same facts as in his unrecorded statement, providing explicit details of the crime. The interview was concluded at 11:30 p.m.

In the trial court, appellant filed a motion to suppress any oral or written state-ments, claiming they were inadmissible under Chapter 38 of the Code of Criminal Procedure and Family Code sections 51.095, 52.02, and 52.025. The trial court denied appellant's motion and this appeal ensued.

## II. STANDARD OF REVIEW

A trial court's ruling on a motion to suppress is generally reviewed under an abuse of discretion standard. *Jackson v. State,* 33 S.W.3d 828, 838 (Tex.Crim.App. 2000). If the resolution of an issue is based upon the evaluation of witness credibility or demeanor, we must grant almost total deference to the trial court's determination of the historical facts. *In re C.R.,* 995 S.W.2d 778, 782 (Tex.App.-Austin 1999, pet. denied). The trial court is the exclusive fact finder in a motion to suppress hearing and, therefore, it may choose to believe or disbelieve any or all of a witness's testimony. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990). We conduct a *de novo* review, however, of the trial court's application of the law to those facts. *Carmouche v. State,* 10 S.W.3d 323, 327 (Tex.Crim.App.2000); *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). Also, we examine the evidence in the light most favorable to the trial court's ruling. *Roquemore v. State,* 60 S.W.3d 862, 866 (Tex.Crim.App.2001).

## III. DISCUSSION

### A. Admissibility of Appellant's Statements

In his first issue, appellant argues the detectives failed to comply with Section 52.02(b) of the Family Code because they did not sufficiently notify appellant's parents he was taken into custody or advise them of his whereabouts. *See* TEX. FAM.CODE § 52.02(b). Further, appellant asserts he was interrogated while at the juvenile processing office in violation of Section 52.025(b), thus rendering his state-

ments inadmissible under Section 51.095. *See id.* §§ 51.095, 52.025(b).

### 1. Section 52.02(b)

Section 52.02(b) provides that a person taking a child into custody must promptly notify the child's parent or guardian of the person's action and a statement of the reason for taking the child into custody. TEX. FAM.CODE § 52.02(b)(1). Appellant argues that this parental notification provision was violated because the detectives made "every effort" to ensure he was arrested and interrogated away from his parents and because Coleman gave his parents inaccurate information as to appellant's whereabouts following his arrest.

The record reflects that immediately after appellant was taken into custody, Detective Coleman went to appellant's home and spoke with appellant's parents. Coleman testified he advised appellant's parents that "some new information had [come] up in the investigation of the death of [Mayoral] and that at that time we had a court order and we were detaining their son for the investigation." Coleman stated he specifically informed appellant's parents that it was "in reference to the homicide of Nathan Mayoral." Further, Coleman advised appellant's parents that Beall was the lead detective in the case and provided them with Beall's office address and phone number. Thus, Coleman complied with the notice requirements of section 52.02(b).

▆ Appellant, however, argues that the notification provision exists to allow parents the opportunity to assist their child while in custody, either through obtaining counsel, being present with the child, or in some other manner; therefore, because appellant's parents were not given correct information as to where appellant was be-

ing held, the intent of the notification provision was frustrated. However, Section 52.02(b) requires that a parent or guardian receive notice only of the child's being taken into custody and the reason for that action. Even if Coleman may have incorrectly advised appellant's parents of the specific address where appellant was taken, this does not necessarily establish a violation of the provision. Although appellant's father testified at the suppression hearing that Coleman intentionally misled him and his wife into believing appellant was not being taken into custody, but was only being questioned, Coleman testified regarding his statements to appellant's parents and that his understanding at the time was that appellant would indeed be taken to 601 Lockwood, the address he provided. The trial court found that "no one attempted to intentionally mislead" appellant's parents as to his whereabouts following his arrest and Coleman's testimony supports that finding. We defer to the trial court's finding on this fact. *In re C.R.*, 995 S.W.2d at 782.

In sum, we find there was no violation of section 52.02(b). Therefore, we do not address whether appellant established a causal connection between a violation of the provision and the making of his statements.[3] *See* TEX.CODE CRIM. PROC. Art. 38.23(a); *Hampton v. State*, 86 S.W.3d 603, 611 (Tex.Crim.App.2002).

### 2. Appellant's Unrecorded Statement

As noted, appellant provided two statements that are at issue here. The first is appellant's unrecorded oral statement given to detectives prior to being admonished of his rights by the magistrate. Beall was allowed to testify at trial as to the contents of this statement. The second statement,

---

**3.** The State argued on appeal that appellant had no standing to raise this issue because it was a right belonging to appellant's parents. Having found no merit in appellant's argu-

ment regarding a violation of the provision, we do not address the State's standing argument.

also made orally, was electronically recorded and given after appellant received the appropriate warnings from the magistrate. This statement was admitted into evidence at trial. Regarding his first statement, appellant argues that Beall and Ortiz violated sections 52.025 and 51.095 of the Family Code by subjecting appellant to "over three hours of continuous custodial interrogation" prior to taking him before the magistrate. *See* TEX. FAM.CODE §§ 51.095, 52.025.

 Title 3 of the Family Code sets forth specific procedures governing the handling of juveniles in connection with issues of detention and confession. *See Contreras v. State*, 67 S.W.3d 181, 184 (Tex.Crim.App.2001); *Comer v. State*, 776 S.W.2d 191, 196 (Tex.Crim.App.1989). The purpose of these procedures is to reduce an officer's impact on a juvenile in custody while also protecting the public. *See Contreras*, 67 S.W.3d at 184; *Baptist Vie Le v. State*, 993 S.W.2d 650, 655 (Tex. Crim.App.1999); *see* TEX. FAM.CODE § 51.01. Police officers and other law enforcement personnel involved in handling juveniles are "bound to comply with the detailed and explicit procedures" of Title 3. *Contreras*, 67 S.W.3d at 184.

 Section 51.095 governs the admissibility of a child's statement taken while in custody. *See* TEX. FAM.CODE § 51.095(b).

Under that section, an oral statement made by a child which is corroborated by evidence establishing his guilt, such as the finding of secreted or stolen property, is admissible in subsequent proceedings against the child. *See* TEX. FAM.CODE § 51.095(a)(2). The State relied on this provision to argue that appellant's first statement was admissible because it was corroborated by evidence establishing his guilt; the trial court agreed, finding appellant's unrecorded statement admissible under this provision.[4] However, although a statement may meet the admissibility requirements of Section 51.095, when the provisions of Title 3, dictating the necessary procedures for taking the child's statement, are violated, the statement may be nonetheless inadmissible. *See Roquemore*, 60 S.W.3d at 867–68 (citing *Comer*, 776 S.W.2d at 196).

Under Title 3, Section 52.025(b) provides that a child may be detained at a juvenile processing office only for limited purposes, one of which is for the "receipt of a statement by the child under section 51.095(a)(1), (2), (3), or (5)." TEX. FAM. CODE § 52.025(b)(5).[5] In addition, even if a child is taken to a juvenile processing office, it does not dispense with the requirement that the officer subsequently and "without unnecessary delay" proceed with one of the options required under Section 52.02(a).[6] *See Vie Le*, 993 S.W.2d

---

**4.** *See, e.g., Kendrick v. State*, 942 S.W.2d 120, 125–26 (Tex.App.-Beaumont 1997, no pet.) (finding statement admissible because evidence corroborated child's guilt); *Salazar v. State*, 648 S.W.2d 421, 422 (Tex.App.-Austin 1983, no pet.) (same); *Meza v. State*, 543 S.W.2d 189, 191–92 (Tex.Civ.App.-Austin 1976, no pet.) (same). In these cases there was no finding that other provisions of the Family Code had been violated.

**5.** Section 52.025(b) states that a juvenile may be held at a juvenile processing office only for the following:
 (1) the return of the child to the custody of a person under Section 52.02(a)(1);

(2) the completion of essential forms and records required by the juvenile court or this title;
(3) the photographing and fingerprinting of the child if otherwise authorized at the time of temporary detention by this title;
(4) the issuance of warnings to the child as required or permitted by this title; or
(5) the receipt of a statement by the child under Section 51.095(a)(1), (2), (3), or (5).
TEX. FAM.CODE § 52.025(b).

**6.** Under Section 52.02(a), police are authorized to take the following actions if the juvenile is not taken to a juvenile processing office:

at 655. Thus, the juvenile processing office is "little more than a temporary stop for completing necessary paperwork pursuant to the arrest." [7] *Id.* at 654.

■ Here, the parties do not dispute that the detectives administered appellant's juvenile statutory warnings while on the way to the juvenile processing office, nor that appellant was in custody when he accompanied Beall and Ortiz to the juvenile processing office. *See Jeffley v. State,* 38 S.W.3d 847, 855–56 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd) (setting forth analysis of "in custody" determination relative to juveniles). Even assuming, however, without deciding that the officers acted in violation of section 52.025 and a causal connection existed between that violation and appellant's statement, we conclude that under the circumstances of this case, admitting testimony regarding appellant's unrecorded statement constitutes harmless error.

### 3. Harm Analysis

■ "Under Rule 44.2 of the Texas Rules of Appellate Procedure, the nature of the error controls the standard under which it is evaluated." *Easley v. State,* 986 S.W.2d 264, 267 (Tex.App.-San Antonio 1998, no pet.). Constitutional error requires reversal of the judgment or punishment unless the reviewing court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. Tex.R.App. P. 44.2(a); *Franklin v. State,* 138 S.W.3d 351, 354–55 (Tex.Crim.App. 2004). Any other error, defect, irregularity, or variance not affecting substantial rights must be disregarded. Tex.R.App. P. 44.2(b); *Franklin,* 138 S.W.3d at 354–55.

■ Because the improper admission of a statement in response to custodial interrogation implicates the constitutional right against self-incrimination, the trial court's error in this case was constitutional error. *Jeffley v. State,* 38 S.W.3d 847, 858 (Tex. App.-Houston [14th Dist.] 2001, pet. ref'd). Accordingly, we must reverse the trial court's ruling unless the record establishes beyond a reasonable doubt that the erroneous admission of the unrecorded statement did not contribute to appellant's conviction. *Id.*

■ In applying this standard of review we do not focus on the propriety of the outcome of the trial. *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex.Crim.App. 2000). Instead, we focus on the error and its possible impact in light of the existence of other evidence. *Id.* To perform a harmless error analysis an appellate court should consider the following factors: (1) the source of the error; (2) the nature of

---

(1) release the child to a parent, guardian, custodian, or other responsible adult upon that person's promise to bring the child before the juvenile court as requested by the court;
(2) bring the child before the office or official designated by the juvenile board if there is probable cause to believe that the child engaged in delinquent conduct, conduct indicating a need for supervision, or conduct that violates a condition of probation imposed by the juvenile court;
(3) bring the child to a detention facility designated by the juvenile board;
(4) bring the child to a secure detention facility as provided by section 51.12(j);

(5) bring the child to a medical facility if the child is believed to suffer from a serious physical condition or illness that requires prompt treatment; or
(6) dispose of the case without referral to the court as authorized under section 52.03. Tex. Fam.Code § 52.02(a).

**7.** Further, the provisions of Title 3 indicate the legislature intended that a juvenile officer make the initial decision to subject a child to custodial interrogation. *See Roquemore,* 60 S.W.3d at 867 (citing to *Comer,* 776 S.W.2d at 196).

the error; (3) whether the error was emphasized and its probable collateral implications; (4) the weight a fact finder would probably place on the error; and (5) whether declaring the error harmless encourages the State to repeat it with impunity. *Wilson v. State*, 938 S.W.2d 57, 61 (Tex.Crim.App.1996). We apply these factors to the error at issue here.

The contents of appellant's unrecorded statement came in at trial through Beall's testimony. Beall gave a brief summation[8] of appellant's unrecorded statement. Following this, the tape-recorded statement—approximately thirty minutes in length—was admitted into evidence and played for the jury. The jury also received a written transcript of the recorded statement.

Appellant's trial attorney questioned, briefly, Beall and Ortiz concerning the unrecorded statement; however, the State did not emphasize the statement during trial. Indeed, at trial, appellant's defense was that his use of Paxil rendered him temporarily insane at the time he murdered Mayoral. This insanity defense was the primary focus of defense counsel's questioning and argument at trial. Likewise, the State concentrated on rebutting appellant's defense. Neither party disputed that appellant had in fact killed Mayoral and had done so as he indicated in his statements. Moreover, his fingerprints were found on the duct tape used to wrap Mayoral's body.

Importantly, appellant's second statement, taken in accordance with Title 3 and properly admitted into evidence, established the same facts as his unrecorded statement. *See, e.g., Littlefield v. State*, 720 S.W.2d 254, 260 (Tex.App.-Beaumont 1986, pet. ref'd) (finding inadmissible written confession taken in "non-compliance" with Title 3, did not result in reversible error because oral confession was properly admitted). In his recorded statement, appellant gave the detectives explicit details concerning the murder. He admitted to calling Mayoral the night before the murder and asking him to "skip school." He admitted that he and Mayoral had sex on the day of the murder, he then killed Mayoral and disposed of his body.

Moreover, appellant's own expert witness, Dr. Johnstone, a doctor treating appellant after Mayoral's murder, testified without objection that appellant "bungled" his way through the murder and was "shocked when it was finished and [appellant] saw blood coming from [Mayoral's] mouth and nose...." He also testified that appellant felt he needed to "somehow get rid of his involvement in homosexual activity ... it became allowable in [appellant's] mind to solve the problems by eliminating [Mayoral]." Further, the doctor stated that appellant said "the thought to kill [Mayoral] appeared as a conclusion in his mind," not something he had thought through. He also stated that appellant was remorseful for having committed the murder.

Given this testimony and appellant's recorded statement, it is unlikely the jury placed much weight on Beall's testimony concerning appellant's unrecorded statement. *See, e.g., Jeffley*, 38 S.W.3d at 859–60. Finally, given the strict requirements upon law enforcement officers imposed by Title 3 regarding interrogation of juveniles, it is unlikely that declaring admission of appellant's first statement harmless would encourage the State to repeat the error with impunity. *See, e.g., id.* at 860. We find the record establishes beyond a reasonable doubt that the admission of

8. Beall's testimony concerning the unrecorded statement occupied approximately two pages of the reporter's record.

appellant's unrecorded statement did not contribute to his conviction.

### 4. Appellant's Recorded Statement

■ Appellant also contends that his second statement, recorded in accordance with section 51.095, was inadmissible because it was a product of his first unrecorded statement. Thus, appellant argues the second statement must be excluded because of the "taint" of illegality of the first statement.

■ Courts have held that once a defendant confesses, a second confession may be "fruit of the first" illegal confession. *See Griffin v. State,* 765 S.W.2d 422, 427, 430 (Tex.Crim.App.1989). The applicable inquiry involving a second confession under the circumstances of this case is one of voluntariness. *See id.* at 427 (noting that the United States Supreme Court has characterized the inquiry of interrogation techniques as "one of voluntariness"). Once the voluntariness of a confession is raised, the State carries the burden of proving the confession was given voluntarily. *Id.* Thus, in considering whether appellant's second statement was voluntary, we examine the totality of the circumstances. *In re R.J.H.,* 79 S.W.3d 1, 8 (Tex.2002); *Rodriguez v. State,* 968 S.W.2d 554, 558 (Tex. App.-Houston [14th Dist.] 1998, no pet.).

In *Griffin,* a case with similar facts, the police arrested a sixteen-year-old for murder and read her statutory rights to her. 765 S.W.2d at 424. The juvenile made an oral statement implicating herself as a party to the murder. *Id.* After making the oral statement, the juvenile was taken before a magistrate who administered the appropriate warnings. *Id.* at 425. The magistrate determined the juvenile understood the warnings. *Id.* at 424–25. As here, the magistrate was not told of the juvenile's prior oral statement. *See id.* at 424. The juvenile then gave a written statement in compliance with the Family Code, which was determined to be admissible. *Id.* at 431. The court found there was no evidence the juvenile would not have given the second statement but for the earlier oral confession. *Id.* at 430.

Here, as in *Griffin,* the State established the officer's compliance with section 51.095(a) before appellant's recorded statement was taken. Appellant does not claim that his prior unrecorded statement was involuntary, nor that he was not admonished of his statutory rights prior to making that statement. Although appellant's second statement closely followed his first, he was taken to a magistrate in the interim. During that time he was not exposed to any adult offenders or threatened or coerced in any manner. When appellant met with the magistrate, he indicated he understood his rights, including his right to have an attorney present and to terminate the interview at any time. Appellant read each of his rights aloud, stated he understood those rights, and initialed each one on the document. Indeed, when appellant indicated he did not understand what was going to happen next, the magistrate informed him the detectives would take him to a juvenile facility and ask him to give a statement, adding, "[y]ou know now that you can if you want to, but if you do not want to, you don't have to." Appellant then gave his statement to the detectives.

In sum, appellant received the required magistrate warnings before his second statement was recorded and was informed he could choose not to speak with the detectives. Although, like *Griffin,* the magistrate in this case was unaware of appellant's earlier oral statement, the magistrate's opinion here was that appellant's recorded statement was voluntary and there is no evidence to the contrary. There is no evidence in the record that but for the unrecorded statement, appellant

would not have given the recorded statement. The trial court did not err in admitting appellant's second, recorded oral statement into evidence. Accordingly, appellant's first issue is overruled.

### B. Waiver of Rights

■ In his second issue, appellant contends the trial court erred in admitting his statements because the State failed to prove he knowingly, intelligently, and voluntarily waived his rights. Appellant acknowledges that the record reflects the magistrate read the statutory warnings to him and that he indicated his understanding of those warnings. Appellant contends, however, that the evidence is insufficient to establish that he knowingly, intelligently, and voluntarily waived those rights.[9]

Section 51.095(a)(5)(A) of the Family Code provides the statement of a child is admissible if:

(5) the statement is made orally under circumstances described by Subsection (d) and the statement is recorded by an electronic recording device, including a device that records images, and:

(A) before making the statement, the child is given the warning described by Subdivision (1)(A) by a magistrate, the warning is a part of the recording, and the child knowingly, intelligently, and voluntarily waives each right stated in the warning.

TEX. FAM.CODE § 51.095(a)(5)(A). The warnings required to be given by section 51.095(a)(1)(A) are as follows:

(i) the child may remain silent and not make any statement at all and that any statement that the child makes may be used in evidence against the child;

(ii) the child has the right to have an attorney present to advise the child either prior to any questioning or during the questioning;

(iii) if the child is unable to employ an attorney, the child has the right to have an attorney appointed to counsel with the child before or during any interviews with peace officers or attorneys representing the state; and

(iv) the child has the right to terminate the interview at any time.

TEX. FAM.CODE § 51.095(a)(1)(A).

Article 38.22, section 3(a) of the Texas Code of Criminal Procedure provides that no oral statement of an accused shall be admissible unless:

(2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning.

TEX.CODE CRIM. PROC. ANN. art. 38.22 (Vernon Supp.2002).

The language in section 51.095 of the Family Code is substantially the same as that contained in article 38.22 of the Code of Criminal Procedure with the exception that the Family Code requires that a magistrate administer the warnings to the child. In construing article 38.22, the Court of Criminal Appeals has held that the law does not require an express waiver of rights. *Rocha v. State*, 16 S.W.3d 1, 12 (Tex.Crim.App.2000). Here, appellant was read the required warnings twice, first by

***

**9.** The State argued that appellant waived this issue for our review by failing to raise it in the trial court. Appellant asserts that the State should not be allowed to contend it was somehow not on notice that the issue in the trial court was whether appellant had knowingly, intelligently, and voluntarily waived his statutory rights. However, we need not decide whether appellant did in fact waive the issue because we conclude there was sufficient evidence that he knowingly, intelligently, and voluntarily waived his rights.

Ortiz and then the magistrate. During his meeting with the magistrate, which was recorded, appellant indicated he understood his rights, including his right to have an attorney present and to terminate the interview at any time. Appellant read each of his rights aloud, stated he understood those rights, and initialed each one on a piece of paper. As noted, the magistrate informed appellant, "[y]ou know now that you can [give a statement] if you want to, but if you do not want to, you don't have to." Following this, appellant proceeded to give his statement to the detectives. Also, appellant understood he was being recorded and did not object. Based on this, the trial court's finding that appellant knowingly and intelligently waived his rights is supported by sufficient evidence. Appellant's second issue is overruled.

### IV. CONCLUSION

In conclusion, we find appellant's recorded statement was properly admitted into evidence and the trial court did not err in overruling appellant's motion to suppress regarding that statement. Also, assuming without deciding that the trial court improperly admitted the testimony concerning appellant's first, unrecorded statement, we find any error was harmless under the circumstances of this case. Further, the record reflects that appellant knowingly, intelligently, and voluntarily waived his statutory rights. Accordingly, the judgment of the trial court is affirmed.